**BOOKLAND OF MAINE, Plaintiff**

v.

**BAKER, NEWMAN & NOYES, LLC, Defendant**

**No. CIV. 01–234–P–H.**

United States District Court, D. Maine.

June 19, 2003.

Order Denying Reconsideration and Certification Aug. 1, 2003.

Robert J. Keach, Esq., Bernstein, Shur, Sawyer & Nelson, Portland, ME, for Bookland of Maine, plaintiff.

Peter W. Culley, Esq., Mark E. Porada, Esq., Pierce, Atwood, Portland, ME, for Baker Newman & Noyes, defendant.

## MEMORANDUM DECISION ON DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR NEW TRIAL

HORNBY, District Judge.

Baker, Newman & Noyes has asked me to amend the judgment to reduce the damages, as a matter of law, to the amount of the stipulated bankruptcy expenses; or to grant a new trial on damages; or, in the alternative, to grant a remittitur of the damages. It argues that the evidence does not support the jury's damage award, that the jury failed to follow the jury instructions on how to calculate damages and that the cause of the jury's failure was Bookland's lawyer's misstatements in closing argument, both in direct closing and rebuttal closing.

■ First, I **DENY** the motion for judgment as a matter of law (seeking to reduce the damages to the stipulated amount of the bankruptcy expenses). There was evidence from which the jury could award a loss of value to Bookland in addition to its bankruptcy expenses.[1]

I turn to the request for new trial or remittitur.

It is true that the evidence does not support the jury's damage award and that the jury could not reach the number awarded by following the jury instructions. The jury instructions on damages were agreed to by both parties.[2] The instructions stated:

You may consider two elements in any economic damage award:

1. Any loss in the value of Bookland as a company up until May 4, 2000 (the

---

1. I discuss some of that evidence in footnote 12 dealing with the remittitur analysis.

2. The damage instruction was altered slightly at the last minute on the record at Bookland's request.

date on which it first filed for bankruptcy), that you find was caused by Baker, Newman & Noyes's act or failure to act; and

2. Any legal and/or administrative expenses that Bookland incurred in the Bankruptcy Court proceedings that you find were caused by Baker, Newman & Noyes's act or failure to act.

Loss in value can occur in a reduction of a company's value from a positive value to a lower positive value; from a positive value to a negative value; or from a negative value to a greater negative value.[3] The measure of value is determined by subtracting liabilities from assets.

The legal and administrative expenses of bankruptcy were stipulated at $416,304.72. The only way the jury could arrive at the total number it awarded, $6,677,267.72, was to add to the stipulated bankruptcy expenses a loss in company value of $6,260,963.00. This latter number is derived by taking the gross assets on Bookland's fiscal year-end 1998 financial statements (1998 being the time of Baker, Newman & Noyes's alleged negligence),

and then subtracting a posited loan amount due to Fleet Bank. That is precisely the calculation that Bookland's lawyer urged the jury to make at the very end of his direct closing:

> And when you come to decide what is the full measure of damage in this case, ladies and gentlemen, you had a company with assets of over $10 million that Mr. Roscoe said was vibrant, was strong, in 1998, with substantial net worth that went into bankruptcy.

> And on the date of bankruptcy, which is the measure that the Judge has instructed you about, you only had a company that was worth the $3,981,000 owed to Fleet.[4] Because you heard that Bookland was liquidated and only Fleet was able to be paid out of the value of the company. And that figure is $6,260,963.[5]

> That is the change in value following the negligence of Baker Newman. And you would add to that, ladies and gentlemen, the undisputed and stipulated administrative expenses that are in Joint 1, and that's approximately $416,000.[6]

Bookland's argument was directly contrary to the jury instruction for determining val-

---

**3.** I had ruled, over Baker, Newman & Noyes's objection, that the jury would be permitted to consider damages under the so-called "deepening insolvency" concept. *See, e.g., Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n,* 274 F.3d 924, 935–36 (5th Cir.2001) (affirming grant of summary judgment where plaintiff presented insufficient evidence of damages of deepening insolvency); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 349–52 (3d Cir.2001) (holding Pennsylvania's Supreme Court would recognize deepening insolvency as a valid theory giving rise to a cognizable injury under state law); *Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir.1983) (concluding "the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability"). The Maine Law Court has not yet had occasion to announce whether it recognizes this type of damages. Certifi-

cation of that issue to the Law Court at the appropriate time has always been under consideration.

**4.** In its brief Bookland admits that this figure was actually the amount owed Fleet in 1998, not the amount owed at the bankruptcy filing, when it had declined to $2.5 million. Pl.'s Opp'n Mem. at 10 (Docket No. 72).

**5.** As the lawyer spoke of assets over $10 million, he was pointing to Exhibit 8, or a summary of it, that showed the actual number of $10,241,963. That is the number from which he subtracted the $3,981,000 to obtain $6,260,963.

**6.** Trial Tr. (Apr. 4, 2003) at 49–50. The jury added the exact bankruptcy expense number that was stipulated, $416,304.72.

ue.[7] The instruction stated clearly that the jury was to consider any decline in Bookland's value caused by Baker, Newman & Noyes's negligence in 1998 and that "the measure of value is determined by subtracting liabilities from assets." But Bookland's argument uses, as a starting point for decline, the value of Bookland's assets in 1998 *without* subtracting its 1998 liabilities (which were undisputed)[8] and compares it to the asserted value of the company in May 2000.[9]

Bookland's lawyer's argument about damages came at the very end of his closing. (He had already surpassed the allotted time for closing argument and was using his rebuttal time.) I became concerned as I listened to his hurried description of damages, but expected that he would proceed to mention the other liabilities. Instead, he shifted quickly to say that his calculation was the same as the judge had ordered in the jury instruction[10] and almost immediately sat down. At that point, I was confused over what he had actually urged the jury to do, but Baker, Newman & Noyes's lawyer did not make any objection. Instead, Baker, Newman & Noyes proceeded to present its own theory of damages. According to Baker, Newman & Noyes's succeeding closing argument, the bankruptcy schedules that Bookland filed in 2000 presented a positive net worth, indeed a net worth higher than shown by the 1998 financial statements. Therefore, Baker, Newman & Noyes's lawyer argued, there could be no damages at all, or at most the stipulated bankruptcy expenses of $416,304.72.

Finally, in rebuttal, Bookland's lawyer told the jury that the bankruptcy schedules that Baker, Newman & Noyes's lawyer had referred to actually included the value of this very lawsuit, Bookland's claim

---

7. Bookland's lawyer's theory of value seems to go all the way back to Bookland's Second Amended Answers to Interrogatories, where it stated: "damages are as follows:

| Liabilities and Shareholders' Equity (1998) | | $10,241,963 |
|---|---|---|
| Less Note Payable | | ( 3,981,000) |
| | TOTAL | $ 6,260,963" |

Pl.'s Opp'n Mem. at Ex. A. (In accounting terms, "Liabilities and Shareholders' Equity" equals Total Assets.) I know of no accounting principles that would support the foregoing calculation as a measure of damages for Bookland. In any event, it is contrary to the agreed upon theory of damages according to which I instructed the jury.

8. Bookland asserts other ways the jury could come up with this number, but none of them works.

9. Baker, Newman & Noyes argues that the argument is contrary to the instruction in another respect, in failing to ask the jury to compare the 1998 value to the value on May 4, 2000, the date of the bankruptcy filing. The comparison, however, was both implicit and explicit in Bookland's lawyer's closing argument, for he was treating the value of

Bookland at bankruptcy as the amount of the Fleet loan, the only liability Bookland paid. (He could have argued that the May 4, 2000, value was lower, by using the liabilities Bookland was unable to pay.) The error in the argument was in treating Bookland's value in 1998 as the total of its assets without subtracting liabilities and in using an incorrect number for the amount due on the loan in 2000.

10. Specifically:

Another approach that the Judge has given you is you start with a value of Bookland at its bankruptcy, that was zero, and you subtract from that the liabilities and other debt obligations, and you end up with the same number, because Fleet was owed money—actually, Fleet took its money, but the vendors were still not paid. There was no shareholder equity at that point, and you heard Mr. Roscoe say that shareholder equity in 1998 was $1.7 million.

Trial Tr. (Apr. 4, 2003) at 50. To the extent I can determine what these statements mean, Bookland's lawyer was inviting the jury to start with a 1998 value of $1.7 million and use a bankruptcy value for the company equal to the amount of the debt it was unable to pay. That is actually the calculation I use in

against Baker, Newman & Noyes. Therefore, he argued, they could not be used in the fashion proposed: ·

> The last numbers [Baker, Newman & Noyes's lawyer] showed you are apples and not apples to oranges, but the asset number he showed you up there, that included-Mr. Keach was the bankruptcy lawyer, but that included the estimated value of the claim in this case.
>
> Those were not the actual assets and the actual assets you'll find in the documents, they were Exhibit 8 with the damage sheets that I had put up for you previously, Pages 919 and 920.[11]

His assertion was erroneous. In fact, although the bankruptcy schedules (which the jury had in the jury room) list the claim against Baker, Newman & Noyes, they assign it *no* value, stating that its value is "unknown." Because Bookland's misstatement about the numbers on the bankruptcy schedules occurred in rebuttal, Baker, Newman & Noyes had no opportunity to respond. But neither did its lawyer object. (I did not have the bankruptcy schedules in front of me and had no idea that Bookland's lawyer's assertion was incorrect.)

■ I conclude that the jury's damage award of $6,667,267.72 cannot stand. It is not supported by the evidence, flows directly from Bookland's lawyer's incorrect argument in closing and is contrary to the jury instructions. The only serious question is whether I should grant Baker, Newman & Noyes's motion for a new trial on damages, or whether I should order a remittitur of some amount instead.

■ On the one hand, we can say that the jury apparently wanted to give Bookland as much as possible. After all, it awarded the exact amount urged by Bookland's lawyer. Arguably, therefore, I could grant a remittitur, but only to the highest amount the evidence would support if the calculation were performed properly.[12] On the other hand, remittitur

---

discussing the proposed remittitur in footnote 12.

**11.** Trial Tr. (Apr. 4, 2003) at 71. Baker, Newman & Noyes also asserts *misconduct* in Bookland's lawyer's statement that "Mr. Keach was the bankruptcy lawyer," arguing that it "likely misled the jury into believing that Mr. Keach's representations had the imprimatur of the bankruptcy court or otherwise were entitled to more weight than the argument of BNN's counsel." Def.'s Renewal Mot. at 18 (Docket No. 67). In fact, I interpreted the statement then, and interpret it now, quite differently from Attorney Culley and Baker, Newman & Noyes. Attorney Thaler was expressing diffidence over his own interpretation of the bankruptcy schedules, and referring to Attorney Keach's role in the bankruptcy to explain his own uncertainty.

**12.** The First Circuit rule "for computing a remittitur is the 'least intrusive' standard. Under that standard, the remittitur amount should reduce the verdict 'only to the maximum that would be upheld by the trial court as not excessive.'" *Conjugal P'ship v. Conjugal P' ship,* 22 F.3d 391, 398 (1st Cir.1994)

(quoting *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1330 (2d Cir.1990)) (citations omitted). Baker, Newman & Noyes argues that Bookland's financial statements from 1998, coupled with its bankruptcy schedules from 2000, demonstrate that Bookland suffered no loss in value, and that the remittitur therefore must take the amount down to $416,304.72, the stipulated amount of the bankruptcy expenses. There was other evidence in the record, however, that the jury was free to credit. Notwithstanding the bankruptcy schedules, there was evidence that Bookland was insolvent when it filed in chapter 11 on May 4, 2000 (it was converted to chapter 7 later), and that Fleet was the only creditor Bookland was able to pay, leaving $3,814,276.17 that is still outstanding to unsecured creditors. The jury was free to use that latter liability as Bookland's negative value on May ·4, 2000. For the highest value Bookland had at fiscal year end 1998, the jury was free to use what the financial statements reported, $1,708,385. Calculating the difference between the highest amount the jury could select for the 1998 value and the lowest

is generally more appropriate than a new trial when the errors in the jury verdict "are readily identified and measured." *Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir.1982), *cited in Havinga v. Crowley Towing and Transp. Co.*, 24 F.3d 1480, 1489 (1st Cir.1994). Since the jury failed to analyze damages in the way I instructed, we cannot be sure of what result would have ensued in this case, or which numbers the jury would have used in performing the calculations, if the jury had assessed value according to the jury instructions. And perhaps the jury would have given more credence to the bankruptcy schedule statement of Bookland's value if the incorrect rebuttal assertion had not occurred.

■ Bookland argues that Baker, Newman & Noyes has waived objections to any untoward effects of the closing arguments by failing to object contemporaneously, and that any misstatements by Bookland's lawyer were cured either by my instructions to the jury (concerning the limitations on closings and the correct method of calculating damages) or by the jury's ability to examine the evidence for itself in the jury room (in particular, the bankruptcy

expense schedules). The First Circuit has approved the following approach for determining whether lawyers' misstatements justify a new trial:

> a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself.

*Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir.1988) (quoting *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir.1980)).[13] Here, the statements made were flatly wrong, there were two of them, they were directly relevant, neither I nor opposing counsel corrected them,[14] the case was close, and the misstatements' impact on the jury verdict is direct and obvious.[15]

Ultimately, therefore, I conclude that a new trial on damages is necessary because the jury failed to follow the instructions on how to calculate damages. I cannot tell what the jury would have done if it had examined the evidence to determine what

amount the jury could select for the May 2000 number yields the number $5,522,661.17 as the greatest possible decline in value. Added to the stipulated bankruptcy expenses of $416,304.72, the total is $5,983,965.89, as the highest amount the jury could legitimately have awarded.

**13.** *Compare Wharf v. Burlington N. R.R. Co.*, 60 F.3d 631, 637–38 (9th Cir.1995) (new trial where losing party proves by clear and convincing evidence that the verdict was obtained by misrepresentation and establishes that misrepresentation prevented losing party from fully and fairly presenting its case or defense).

**14.** My general instructions about closing arguments not being evidence and not overriding what I tell the jury about the law do not suffice.

**15.** Many of the cases where trial or appellate courts uphold jury damage verdicts in the face of challenges based upon improper closing arguments involve alleged appeals to passion or prejudice and its asserted impact on intangible damages like pain and suffering. It is very difficult to evaluate the impact of an improper argument on intangible damages. Therefore, courts typically find that conventional instructions telling jurors to set aside their sympathies, prejudices and passions, and that what the lawyers say is neither law nor evidence are sufficient to uphold the verdict. *See, e.g., Smith v. Kmart Corp.*, 177 F.3d 19, 27–28 (1st Cir.1999); *United States v. Machor*, 879 F.2d 945, 955–56 (1st Cir.1989); *United States v. Doe*, 860 F.2d 488, 494–95 (1st Cir.1988); *Forrestal v. Magendantz*, 848 F.2d 303, 309–10 (1st Cir.1988); *United States v. Mejia–Lozano*, 829 F.2d 268, 273–74 (1st Cir.1987)

numbers to use in performing the calculations, instead of accepting Bookland's lawyer's incorrect description of value. But liability and causation are properly established by the previous verdict. The new trial will be limited to a determination of the difference in Bookland's value between the time Baker, Newman & Noyes conducted its review of Bookland's fiscal year 1998 financial statements and the date Bookland filed in chapter 11, May 4, 2000.

So Ordered.[16]

## ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION, DEFENDANT'S MOTION TO REOPEN DISCOVERY AND DEFENDANT'S MOTION TO CERTIFY THE DEEPENING INSOLVENCY ISSUE

All pending motions are DENIED.

### I. BOOKLAND'S MOTION FOR RECONSIDERATION

1. Bookland is correct that the original jury instruction did not require the jury to

16. Because of my ruling, the plaintiff's motion to amend judgment to add interest is MOOT.

1. The Jury was instructed to calculate economic damages as follows:
    You may consider two elements in any economic damage award:
    1. Any loss in the value of Bookland as a company up until May 4, 2000 (the date when it first filed for bankruptcy), that you find was caused by Baker, Newman & Noyes's act or failure to act; and
    2. Any legal and/or administrative expenses that Bookland incurred in the Bankruptcy Court proceedings that you find were caused by Baker, Newman & Noyes's act or failure to act.
    Loss in value can occur in a reduction of a company's value from a positive value to a lower positive value; from a positive value to a negative value; or from a negative value to a greater negative value. The measure of value is determined by subtracting liabilities from assets.

choose the actual date of the bankruptcy filing as its comparison point in determining the company's loss of value. *See* Bookland's Mot. Recons. at 2 & n. 1 (Docket No. 81). The bankruptcy filing date, May 4, 2000, was merely an ending point. *See* Jury Instrs. at 14 (Docket No. 62).[1] Nevertheless, I used that date in my Order of June 19, 2003, granting Baker, Newman & Noyes's motion for a new trial on damages, because that is the date that Bookland's lawyer chose to use in his closing argument.[2] He showed the jury a total asset value in 1998 of $10,241,963, without subtracting any liabilities, and then stated:

And *on the date of bankruptcy,* which is the measure that the Judge has instructed you about, you only had a company that was worth the $3,981,000 owed to Fleet. Because you heard that Bookland was liquidated and only Fleet was able to be paid out of the value of the company. And that [damage] figure is $6,260,963. *That is the change in value following the negligence of Baker Newman.*

If you award economic damages to Bookland on more than one Count, they will not be added together. Instead, judgment will be entered against Baker, Newman and Noyes for the single largest award you make.

2. The last sentence of my Order of June 19, 2003, is to that extent incorrect. The word "difference" in that sentence was a typographical error for the word "decrease," and the sentence should read: "The new trial will be limited to a determination of the decrease in Bookland's value between the time Baker, Newman & Noyes conducted its review of Bookland's fiscal year 1998 financial statements and the date Bookland filed in chapter 11, May 4, 2000." I did not intend in that sentence to imply that May 4, 2000 was the only date for measuring any damages to Bookland, but the jury ultimately must choose one date as of which to measure any decreased value of Bookland.

Trial Tr. (April 4, 2003) at 49–50 (emphasis added). As I stated in my June 19 Order, the jury followed Bookland's lawyer's analysis on how to determine damages precisely, starting with the gross asset value in 1998 and then subtracting an asserted value for the company upon the filing date in 2000. This analysis was simply wrong.[3] Bookland now says that its "counsel urged the jury in its closing to compare the 1998 asset value with the asset value just prior to the first of the store closings [some months before the bankruptcy], to wit: the $3,981,000 paid to Fleet prior to and during bankruptcy from sales of stores." Bookland's Mot. Recons. at 2 & n. 2. Bookland refers to no transcript pages from its closing argument to support this assertion, and the assertion is directly contrary to the language I have quoted.[4]

2. The damage instruction was not just an "approach advocated by the Court and included within the instruction." *Id.* at 2. Instead, it was the Court's instruction as to the *only* method of measuring damages, and was agreed to by the parties at the charge conference. Neither party objected to it when the charge was delivered to the jury (except insofar as Baker Newman & Noyes objected to the deepening insolvency measure of recovery). Indeed, it was apparently the only available method of measuring damages in this trial, since no expert business valuation testimony was presented. Thus, Bookland cannot sustain the verdict by arguing that its lawyer's different method of damages "generates the same result." *Id.* (And in fact, it does not generate the same result for the reasons I set forth in my original Order.)

3. Bookland offers no support in accounting principles for its proposal that the company's value as of a point in time can be determined by picking numbers from a variety of dates, such as the total loan repayment to Fleet that transpired over a period of time during 1999 and 2000, *see id.* at 2 n. 2; and other liabilities of $8,533,378 derived from the 1998 financial statements that, according to Bookland, without citation to the record, "were nearly constant" during a period of two years and therefore could be used for the 2000 calculations as well. *Id.* at 2; *see also id.* at 4. It is therefore not enough to argue that "the approach shown to the jury was a permissible shorthand method because of the identity of the Fleet debt and year 2000 value." *Id.* at 3.

4. Bookland erroneously argues that its lawyer's misstatement about the bankruptcy schedules could not have had a prejudicial impact because the jury was not entitled to rely upon their contents. *See id.* at 6. To the contrary, as admitted evidence, they were available for use by the jury. Bookland alternatively argues that the jury was free to examine the schedules in the jury room and find for itself the lawyer's error. *See id.* at 6 n. 8. We expect a lot of a jury, but that is too much.

5. As I noted in my original Order, Bookland presents a number of possible calculations that could yield jury verdicts somewhere in the general vicinity of the verdict. Unfortunately for Bookland, this is a case where the basis for the jury verdict is precisely ascertainable because

**3.** Bookland points out that it used the same analysis in its April 2, 2003 brief in support of its proposed jury instructions. *See* Bookland's Mot. Recons. at 4 n. 5. That does not make the analysis correct, and Bookland still has not come to grips with the fact that the decrease in value is measured by comparing assets minus liabilities at two distinct points in time.

**4.** I have reviewed the transcript of Bookland's closing argument and find this alleged argument nowhere.

the jury did exactly what Bookland's lawyer urged, and it was wrong.

## II. BAKER NEWMAN & NOYES'S MOTION TO REOPEN DISCOVERY

This motion is **DENIED.** This case was fully prepared, and proceeded to a full trial on the merits. It is too late for the lawyers to determine, now that they have seen what happened at the first trial, that they would like some more information before they conduct the second (partial) trial on damages.

## III. BAKER NEWMAN & NOYES'S MOTION TO CERTIFY THE DEEPENING INSOLVENCY ISSUE

This motion is DENIED. I do not believe the issue is ripe for certification to the Maine Law Court until we have a jury verdict on damages that demonstrates that deepening insolvency played a part in the jury's determination.[5] The original verdict did so, but on Baker Newman & Noyes's motion I vacated that original verdict on damages and I have no idea what verdict a new jury will give.

SO ORDERED.

---

5. Contrary to Baker Newman & Noyes's assertion, I did not originate the deepening insolvency theory of Bookland's damages. Defs.' Mot. Certify at 3 (Docket No. 87). Bookland's lawyer used that term on April 1 at the end of the jury day when I pressed him on Bookland's theory of damages.